# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

REBECCA L. BELLINGER,

    Plaintiff,

    v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

No. 3:17-cv-1692 (MPS)

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

    In this appeal from the Social Security Commission's denial of benefits, plaintiff Rebecca L. Bellinger argues that the Administrative Law Judge (ALJ) erred because he (1) did not consider the weekly infusions required to treat Bellinger's anemia in assessing the severity of that condition or in evaluating her residual functional capacity (RFC); (2) did not consider the severity of Bellinger's neck pain; (3) failed to state his reasons for declining to give controlling weight to the medical source opinion of Bellinger's treating neurologist; (4) failed to apply the treating physician rule to the joint opinion of Bellinger's treating psychiatrist and therapist; and (5) failed to explain how he considered the records from a consultative examination with a psychologist. I agree with Ms. Bellinger's first, third, and fourth arguments and grant her motion to remand the case to the Commissioner. I express no opinion on her remaining arguments.

    I assume familiarity with the procedural history of the case, the ALJ's opinion, the record, and the five sequential steps used in the analysis of disability claims. I incorporate the relevant portions of Bellinger's medical history as necessary to my analysis of her argument in this appeal.[1]

---

[1] The parties failed to reach an agreement on the facts in this case. Accordingly, the plaintiff filed her own statement of facts along with her brief. (*See* ECF No. 22-1.) Rather than responding to the Plaintiff's statement as required by the Court's standing order, the Commissioner provided a separate, longer, but

## STANDARD OF REVIEW

"A district court reviewing a final . . . decision pursuant to ...42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Accordingly, a district court may not make a de novo determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the correct legal principles were applied in reaching the decision, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982). The Second Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citation and quotation marks omitted). Substantial evidence must be "more than a mere scintilla or a touch of proof here and there in the record." *Id.*

## DISCUSSION

I.     **The ALJ Failed to Consider Mr. Bellinger's Frequent Anemia Treatments in Formulating the RFC**

Ms. Bellinger argues that the ALJ erred by failing to consider the length and frequency of her treatments for anemia in in formulating the RFC. I agree.

---

largely overlapping statement. (ECF No. 23-1 at 2.) I draw the facts from the ALJ's decision and the record, noting the parties' statements of facts where relevant.

Ms. Bellinger developed anemia following gastric bypass surgery in 2008. (ECF No. 16-3 at 25; ECF No. 16-11 at 262.) In June 2014, she began weekly intravenous infusions lasting 2-3 hours for 10 weeks followed by a one-month break. (ECF No. 16-3 at 25; ECF No. 16-11 at 153-262.) The treatments took place at the New London Cancer Center. (ECF No. 16-11 at 196.) Ms. Bellinger reported feeling fatigued at several of her infusion appointments. (*See* ECF No. 22-1 at 5; ECF No. 16-11 at 153, 156, 159, 260.)

At step two, the ALJ acknowledged Ms. Bellinger's anemia and treatments. (ECF No. 16-3 at 25.) He concluded that the anemia was "non-severe" because she "responded well to treatment with no side effects or evidence of end-stage organ disease . . . ." (*Id.*) The ALJ also noted that, although Ms. Bellinger was treated at a cancer center, there was "no evidence of cancer in the record." (*Id.*)[2] In formulating the RFC, the ALJ again noted Ms. Bellinger's testimony regarding her treatments but did not explain whether or how he incorporated that information into his conclusion. (ECF No. 16-3 at 28.)

While the ALJ need not explicitly analyze every piece of evidence in the record, *see Lowry v. Astrue*, 474 F. App'x 801, 805 (2d Cir. 2012), he "must include a narrative discussion describing how the evidence supports each conclusion." *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P, 1996 WL 374184 at *7 (S.S.A. July 2, 1996). A discussion is sufficient when it allows a reviewing court to "glean the rationale" of the ALJ's decision. *Lowry*

---

[2] Ms. Bellinger contends that the ALJ erred in step two when he determined that her anemia was not a severe condition. In formulating the RFC, the ALJ must consider *all* impairments, including those that he concluded were not severe in step two. 20 C.F.R. § 404.1545 ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe . . . .'"). Ms. Bellinger does not contend that her impairments met or medically equaled the criteria listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P, Appendix 1. Because I conclude that the ALJ erred in failing to consider Ms. Bellinger anemia treatments in formulating the RFC, I need not determine whether he also erred at step two. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (holding that an error in assessing the severity of an impairment in step two was harmless when the ALJ considered the same impairment in subsequent steps).

474 F. App'x at 805; *Quinto v. Berryhill*, No. 3:17-CV-00024 (JCH), 2017 WL 6017931, at *5 (D. Conn. Dec. 1, 2017).

"The RFC assessment must be based on *all* of the evidence in the case record . . . including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8P, 1996 WL 374184 at *5. "Absenteeism due to the frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded." *Griffin v. Comm'r of Soc. Sec.*, No. 2:15-CV-13715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017). "Where the ALJ has made no findings about the limitations caused by the claimant's need for treatment, courts have remanded because it is not the role of the court to speculate as to the ALJ's rationale." *Quinto*, 2017 WL 6017931, at *5. In *Quinto*, for example, the court concluded that remand was necessary where the ALJ failed to consider testimony that the claimant required nebulizer treatments every four to five hours. *Id.* at *9. The court explained that the error was not harmless because the vocational expert had opined that using the nebulizer once or twice per day would preclude all employment. *Id.*

In this case, Ms. Bellinger's testimony and her medical records establish that she received weekly IV infusions for anemia that lasted 2–3 hours. (ECF No. 16-3 at 64; ECF No. 16-11 at 153-262.) The ALJ acknowledged that Ms. Bellinger was concerned that she might lose her job due to absences from her condition (*id*. at 36, 37), and that absences due to appointments with specialists could affect her employment prospects (*id*. at 39) ("Despite her medical conditions *and frequent appointments with specialists*, the complainant is able to perform . . . .") (emphasis added). Although the ALJ also acknowledged Ms. Bellinger's anemia and treatments (ECF No. 16-3 at 25), he concluded that Ms. Bellinger had

the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she could perform simple, routine and repetitive tasks. In addition, she could occasionally bend, balance, twist, climb, crawl, kneel, and squat. Furthermore, she could have occasional social interaction with coworkers, supervisors, and the general public.

(*Id.* at 27.) The ALJ offered no explanation for declining to incorporate Ms. Bellinger's need to be absent for weekly treatments into his RFC. As in *Quinto*, the ALJ's silence on the issue is significant considering the testimony of the vocational expert. Here, the vocational expert provided a non-exhaustive list of jobs that would be available to a person with the RFC that the ALJ described. (*Id.* at 74.) He also opined, however, that "there would be no jobs" for a person who was absent from work more than "one or two times per month" over a six-month period. (*Id.* at 75.) The ALJ did not acknowledge the vocational expert's opinion on absenteeism in his decision, (*id.* at 41) (discussing the vocational expert's testimony), and he failed to address evidence in record showing that Ms. Bellinger had weekly treatments for her anemia, albeit with regular one-month breaks, for more than a year. (ECF No. 16-11 at 153-262.) Thus, there is evidence in the record contradicting the ALJ's RFC assessment and his determination about the availability of work for a person with Ms. Bellinger's impairments and treatment needs.

The Commissioner argues that the ALJ explicitly discussed the treatments and later stated that the RFC assessment accounted for *all* of Ms. Bellinger's impairments; thus, the decision shows that the ALJ incorporated the disruptions from anemia treatment into his analysis. (ECF No. 23-1 at 29.) I disagree. While the ALJ briefly described the anemia treatments, nothing in his decision demonstrates that he recognized the need to account for the "mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8P. In describing his assessment of Ms. Bellinger's RFC, he focused only on her symptoms. (*Id.* at 27) ("In making this finding, the undersigned has considered all symptoms and the extent to which

these symptoms can reasonably be accepted as consistent with the objective medical evidence . . . .") Without an explanation of how the ALJ considered the infusions (or any indication that he recognized the need to consider them at all), I cannot determine whether he properly applied the law or whether his conclusions were supported by substantial evidence. *See Hartman v. Colvin*, 954 F. Supp. 2d 618, 645 (W.D. Ky. 2013) (finding that remand was appropriate in part because the ALJ did not "directly speak to the question of medically necessary, but otherwise excessive, absenteeism and its impact on Hartman's ability to perform substantial gainful activity."); *see also Wilson v. Colvin*, No. 14CV5666 DF, 2015 WL 5786451, at *29 (S.D.N.Y. Sept. 29, 2015) ("[T]he ALJ, while not required to address the alleged side effects in his decision, at least needed to make clear that he had considered them in making his determination.").

The Commissioner also contends that the ALJ's decision was correct because Ms. Bellinger failed to establish that her treatments could only occur during working hours. (ECF No. 23-1 at 30.) Even if I found that explanation persuasive, I may not affirm the ALJ's decision based on the Commissioner's post hoc rationalizations. *See Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009) ("A reviewing court may not accept appellate counsel's post hoc rationalizations for agency action.") (quotation marks omitted). Nothing in the ALJ's decision suggests that he concluded that Ms. Bellinger's anemia treatments could be scheduled outside of working hours. Nor does the Commissioner point to anything in the record that would support such an inference. To the contrary, as the ALJ noted, the claimant's testimony suggests that her need for medical treatment—apparently during weekdays— has required her to work an evening shift and miss 5 to 6 days a year. (ECF No. 16-3 at 28.) If the ALJ considered Ms. Bellinger's treatments but found that they did not alter his analysis, remand is appropriate to provide him with an opportunity to set forth his reasoning fully.

## II.     The Treating Physician Rule

Ms. Bellinger next contends that the ALJ erred in his application of the "treating physician rule." Specifically, Ms. Bellinger argues that the ALJ failed to explain his reasoning for declining to give controlling weight to the opinions of her treating neurologist, Dr. Coiculescu, and to the joint opinion of her therapist and treating psychiatrist, Ms. Perry and Dr. Traboulsi. (ECF No. 22-2 at 12–19.) Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citation and quotation marks omitted).[3] "The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009). The Second Circuit has required that:

> [T]he ALJ must explicitly consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist. After considering the above factors, the ALJ

---

[3] The Social Security Administration recently adopted regulations effectively abolishing the treating physician rule. *See* 20 C.F.R. § 416.920c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources . . . . [W]e will consider those medical opinions . . . together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."). The new regulations apply only for claims filed on or after March 27, 2017. *Id.*   Because Ms. Bellinger filed her claim before March 27, 2017, I apply the treating physician rule under the prior regulations. *See Tanya L., Plaintiff, v. Comm'r of Soc. Sec., Defendant.*, No. 2:17-CV-136, 2018 WL 2684106, at *4 n. 1 (D. Vt. June 5, 2018) ("Because Plaintiff filed her claims before March 2017, however, the Court applies the treating physician rule under the earlier regulations (20 C.F.R. § 416.927), and not under the more recent ones (20 C.F.R. § 416.920c).").

must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.

*Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal citations, quotation marks, and alterations omitted). "The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.*

### i. The ALJ Did Not Sufficiently Explain His Reasoning for Declining to Give Dr. Coiculescu's Opinion Controlling Weight

Ms. Bellinger argues that the ALJ erred in failing to explain his reasons for giving "less weight" to the opinion of her treating neurologist. I agree. Dr. Coiculescu opined that Ms. Bellinger suffered from "post-surgical headache[s]" that rendered her "incapable of even 'low stress' jobs." (ECF No. 16-11 at 150–151.) The ALJ explained that he gave less weight to Dr. Coiculescu's treating source opinion because "it is not a function by function assessment, and it is not consistent with normal physical exams from treating cardiac, vascular, PCP, and neurology sources, as discussed above." (ECF No. 16-3 at 39.) The ALJ purported to give weight to Dr. Coiculescu's opinion that Ms. Bellinger required "a low stress work environment" due to her medical conditions. (*Id.*)

The ALJ's discussion of Dr. Coiculescu's opinion is deficient for three reasons. First, "the Court is aware of no authority that determines that a treating physician's opinion should be cast aside where it does not include a function-by-function assessment of the claimant's capabilities." *Stango v. Colvin*, No. 3:14-CV-01007 (CSH), 2016 WL 3369612, at *11 (D. Conn. June 17, 2016) (quotation marks omitted). If the ALJ concluded that a function-by-function assessment was necessary, "[his] role was to further develop the record as to [Dr. Coiculescu's] assessment," rather than declining to give the opinion weight. *Id.*

Second, the ALJ neither addressed the *Greek* factors in deciding to give "less weight" to Dr. Coiculescu's opinion nor provided a basis from which to infer that he considered those factors without discussing them explicitly. The ALJ apparently recognized that Dr. Coiculescu is a specialist, and that Ms. Bellinger first saw Dr. Coiculescu in January 2015 (ECF No. 16-3 at 34.) The ALJ did not discuss how frequently Ms. Bellinger saw Dr. Coiculescu or evaluate the amount of medical evidence supporting the neurologist's opinion. Although the ALJ concluded that Dr. Coiculescu's opinion was inconsistent with normal physical exams from other treating sources, he did not specifically identify any contradictory sources. (*Id.* at 38.) Indeed, the ALJ did not identify any other physician who considered or treated Ms. Bellinger's chronic headaches after Ms. Bellinger began seeing Dr. Coiculescu in January 2015. (*See* ECF No. 16-3 at 34–38.) The record suggests that Dr. Coiculescu believed Ms. Bellinger's complaints about her headaches and attempted several pharamacological interventions with varying degrees of success. (*See* ECF No. 16-11 at 54, 61, 67.) Dr. Coiculescu opined that Ms. Bellinger's headaches were "post-surgical" and were caused by a "[history] of aneurysm." (ECF No. 16-11 at 150.) Nevertheless, the ALJ found that there was "no objective explanation for the claimant's recurring headaches." (ECF No. 16-3 at 39.) "While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks and alterations omitted). The ALJ did not adequately explain why he declined to credit Dr. Coiculescu's conclusion. (*Id.*)[4] Instead, he

---

[4] The ALJ noted that he found Ms. Bellinger's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible . . . ." (ECF No. 16-3 at 38.) The ALJ did not discuss Ms. Bellinger's credibility further, he made no specific finding about the credibility of her testimony at her hearing, and he cited no

apparently determined on his own that the claimant's headaches were the product of "psychosocial stress at home," "marital conflict," and "financial stress." (ECF No. 16-3 at 39.)

Third, the ALJ clearly misstated the portion of Dr. Coiculescu's opinion to which he purportedly assigned greater weight. While he indicated that he gave weight to the conclusion that Ms. Bellinger could work in a low-stress environment (ECF No. 16-3 at 39), Dr. Coiculescu opined that Ms. Bellinger was "incapable of even 'low stress' jobs," (ECF No. 16-11 at 151.) The Commissioner argues that the error was merely typographical and was harmless in any event because "the ALJ made clear he did not adopt Dr. Coiculescu's findings on Plaintiff's stress limitations . . . ." (ECF No. 23-1 at 33.) On the contrary, the only portion of Dr. Coiculescu's findings to which the ALJ gave weight were those related to stress limitations. The ALJ did appear to conclude that Ms. Bellinger could work in a low-stress environment. (ECF No. 16-3 at 39) ("In light of her low stress tolerance, the undersigned finds the particular work environment at the casino may not be conducive to the recommended low stress environment she needs due to her bipolar disorder, anxiety, and residual effects of the aneurysm.") As a result, I cannot conclude that the error was harmless.

### ii. The ALJ Failed to Explain Adequately Why the Treating Physician Rule Did Not Apply to the Joint Opinion of Ms. Perry and Dr. Traboulsi

Ms. Bellinger also argues, and I agree, that the ALJ erred in failing to consider adequately whether the treating physician rule applied to the joint opinion of her treating psychiatrist, Dr. Traboulsi, and therapist, Ms. Perry. The ALJ explained that Ms. Perry completed a mental health medical source statement opining that Ms. Bellinger was moderately or markedly impaired across

---

other evidence in the record contradicting her reports. Thus, if the ALJ gave Dr. Coiculescu's opinion "less weight" because he found Ms. Bellinger had misrepresented the severity of her symptoms, he failed to make that finding clear.

a variety of domains, including social interactions, concentration, responding to work pressures, and understanding and remembering instructions. (ECF No. 16-3 at 38.) The ALJ gave the opinion "less weight" because Ms. Perry "is not an acceptable treating source." (*Id.* at 40.) While he recognized that Dr. Traboulsi co-signed as a treating psychiatrist, he found, without explanation, that "Ms. Perry complete[d] the assessment" and that "the opinion [was] not consistent with the objective clinical findings in the psychiatric and therapy notes." (*Id.*)

It is true that Ms. Perry is not herself a treating physician or other "acceptable medical source." 20 C.F.R. § 404.1513(a). But that conclusion does not end the inquiry. First, the ALJ offers no explanation for his conclusion that Ms. Perry completed the mental health medical source statement. (ECF No. 16-3 at 38). Further, even if Ms. Perry did complete the statement, the ALJ failed to consider whether the opinion was entitled to consideration under the treating physician rule because Dr. Traboulsi "independently considered and endorsed" it. *See Wiggins v. Colvin*, No. 3:13CV1181 (MPS), 2015 WL 5050144, at *2 (D. Conn. Aug. 25, 2015) (remanding because the ALJ had failed to address whether a therapist's opinion, considered and endorsed by a treating psychiatrist, was entitled to weight under the treating physician rule); *Payne v. Astrue*, No. 3:10-CV-1565 JCH, 2011 WL 2471288, at *5 (D. Conn. June 21, 2011) (holding that the co-signature of a treating physician on a physician assistant's opinion raised possibility that the treating physician rule applied).

The Commissioner argues that any error with respect to ALJ's discussion of the joint opinion was harmless because he concluded that the joint opinion was inconsistent with the record. (ECF No. 23-1 at 34–35.) The ALJ did not cite specific evidence contradicting the opinion, however, and my review of the record suggests that the opinion was sufficiently supported to raise a question about whether the ALJ should have deferred to Dr. Traboulsi's medical judgment. The

ALJ explained that the joint opinion was "contradicted by her own and Dr. Traboulsi's psychiatric treatment notes, which show stable mood, moderate to mild depression and anxiety (GAF 50-60), and mostly intact memory, concentration and attention to allow her to function independently at home and at work." (ECF No. 16-3 at 40.) I find that the ALJ's medical chronology overlooked evidence in the treatment notes that would support the opinion that Dr. Traboulsi and Ms. Perry provided. For example, the ALJ explained that, at an appointment with Dr. Traboulsi in August 2015, Ms. Bellinger "reported mild improvement in her depression with Lexapro and Dr. Traboulsi observed no major mood instability." (*Id.* at 37) (citing ECF No. 16-10 at 40.) The ALJ failed to acknowledge that, at the same appointment, Dr. Traboulsi noted Ms. Bellinger's judgment was only "fair," that she had "poor recent recall" due to her aneurysm, and that she was experiencing symptoms of anxiety. (ECF No. 16-10 at 41.) The treatment notes by Dr. Traboulsi and Ms. Perry contain some evidence to support the conclusions in their joint mental health medical source statement and the ALJ did not cite any other medical opinion contradicting those conclusions. Thus, I cannot conclude that the ALJ's failure to explain his reasoning for giving the joint opinion "less weight" was harmless error.

## CONCLUSION

For the reasons discussed above, Ms. Bellinger's motion to reverse or remand the Commissioner's decision (ECF No. 22) is GRANTED in part. The Commissioner's motion to affirm that decision (ECF No. 26) is DENIED. The case is hereby remanded to the Commissioner for proceedings consistent with this order.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            December 21, 2018